and we'll call our second case of this morning. Number 20-25 14 Maple v. Superintendent Albion SCI, Messrs Peck and Capozzi. May it please the court. Good morning. My name is John Peck. I represent Michael P. Clark, the superintendent of SCI Albion. This is a case where the district court vacated convictions of Jason P. Maple for offenses of first-degree murder, attempted homicide, aggravated assault, robbery, conspiracy to commit those offenses. Principally, the court reversed the convictions because the defendant... Do you wish to reserve time for rebuttal? I'm sorry. Do you wish to reserve time? No, Your Honor, I don't. Okay. Principally, the court reversed the convictions because it found that the appellee, Mr. Maple, in this particular case was compelled to testify on his own behalf because the Commonwealth had introduced a confession which was later held to be improperly obtained and to overcome the impact of that confession, the defendant was forced to testify. The facts of the case do not substantiate that conclusion. So you challenged that there was a Miranda violation here, but under AEDPA, aren't we required to defer the Superior Court's determination that there was a Miranda violation? Yes, Your Honor, I think you are. Okay. And if that's correct, an issue that we haven't clearly decided yet, what makes this unreasonable, so beyond the bounds of what we would defer to? What's unreasonable about it is the fact that the defendant had two trials. In the first trial, he did not testify. He called, and this is noted in the lower court's opinion, I think on footnote eight, he called his girlfriend to testify to his intoxication on the night of the homicide. For some reason, she was unwilling and did not testify at the second trial, so the defendant took the stand. His only defense in this case that was presented was that he was intoxicated to the extent that he could not form the specific intent to kill and that there was some provocation in that the person who was killed had threatened to rape his girlfriend, the woman who testified on his behalf, that he was intoxicated. The standard in Harrison is that the defendant needs to overcome the impact of the confession. Wait a minute, so now you're talking about harmless error, but are you disputing that there was a Miranda violation in the first place? I'm not at this time, Your Honor. You're not, okay. All right, you could have argued that, but let's set that aside. So you want to focus on, you know, that there was a harmless error, but that's, I mean, that's an issue that was found adversely to you below. So how should we review that? Under what standard? Well, under the standard that the court did not properly evaluate the evidence, because the defendant, if you look at the testimony that he provided, and this is in the court's opinion as well. So which way does epidephrines cut on the harmless error? Well, I think the court in the lower court had to find that the harmless error decision was unreasonable, which it wasn't in this particular case, because the defendant, by taking the stand, did not really advance his case, because he was testifying to exactly what he had told the police in his confession. Except that the district court's theory was that he felt like he had to take the stand to explain away once the cat was out of the bag. So why is that, why was that not, you know, appropriate for the district court to reason thus, that it would have changed the whole way the case would have gone? Well, you know, to be perfectly blunt, Your Honor, if he simply repeats, which he did, the confession he gave to the police, he only makes matters worse. He doesn't advance his case at all. So the only way he was to advance his case is to move to another defense, which would be this provocation, some sort of voluntary manslaughter perhaps resulting, or diminished capacity, which would reduce first degree to third degree. So that's why he testified, not because he was impelled to testify because of the confession, because he just repeated what he had said in the confession. He gave the same narrative. He only, what he expanded was the fact that he was intoxicated and that his girlfriend, excuse me, his girlfriend had been threatened. But I think the district court's logic was he wouldn't have felt the pressure to go and say more and then risk getting tripped up about it if the cat weren't out of the bag in the first place. Well, to that extent, Your Honor, I would argue that the cat was already out of the bag. He had encountered a number of people that evening. He had found the person he killed in his friend at a bar and confronted them and argued with them, screamed at them. I think he even pushed one of them. He returned to his girlfriend's apartment where they had found property destroyed. But if the cat was already out of the bag, why admit the two confessions? Well, Your Honor, you have so much evidence, you know, it's sort of like I get it as somebody who litigated, you know, you want to win and you want to pile on. But if you could think here, there's an issue. So why put that confession into evidence? Well, Your Honor, you know, the court, the lower court, who was a very experienced trial judge, Judge Pezzi, had ruled that it was admissible. You know, I don't feel like in good faith that I can argue that it should not be suppressed and then remove it from the case because I don't believe the judge made the correct decision. I thought the judge did make the correct decision. And I still think the judge made the correct decision. But the posture the case is in now, that's sort of water over the dam now. But there's an argument you have a whole lot of really good evidence of guilt absent that. That's right, Your Honor. And absent that, you wouldn't be here today. Well, you know, you never know what these 12 people who sit as jurors and you know how interested or uninterested they are in your particular case. And the defense did have this intoxication. I guess I'm asking a question in hindsight, which is not a great way to look at it. Well, I thought about it numerous times myself, Your Honor, believe me. You know, you always wish you were smarter than you were when you make these decisions. But, you know, he still was presenting an intoxication defense. And according to himself, he had consumed an enormous amount of alcohol that weekend leading up until Memorial Day in 2006. And there had also been the comment made that this person who was killed had threatened his girlfriend with rape. So are you taking the position that even if the trial testimony as well as the other two confessions was tainted, that the independent evidence was such that it would still be harmless? Yes, Your Honor. The untainted evidence was nonetheless overwhelming as to his guilt. Everybody who ran into him that evening repeated the fact that he had been threatening towards the person who had been killed and his friend. Their names were Altman and Tech. And then he lured three of his friends, Nathan Shank, Dwayne Shank, and Ryan Bernoski to assist him. We're familiar with the record. But how does that account for Fulminante's recognition of the special importance that a confession on the stand has to a jury? Well, you know, I know the court says that it does have importance. But I've had cases where people, you know, police have testified to confessions and defendants were found not guilty. You know, it's still for the jury to decide whether that confession is sufficient or not. And the idea of specific intent is something that's in a person's mind, which is best demonstrated during a trial by the person's behavior and the person's statement, statements during, you know, leading up to the killing. And so that is, to me, as a prosecutor, is the most significant evidence you can have. That's what we presented, witnesses who talked about the fact that he had threatened the victim, that he had enlisted the other people to aid him, the Bernoski and the Shanks, and that he had gone to where they located the victim, the victims in this particular case, and took a shotgun and actually tried to enter the home but was called off. And then there's testimony of how he followed the two victims along the railroad tracks and fired a shot. And the court says, well, you didn't have the critical evidence of intent. The lower court said you didn't have the critical evidence of intent in this case. We certainly did. The fact that he's armed with a shotgun, the fact that he tried to get into this diner where they were located, the fact that he followed them for a period of time and then called them, you know, yelled at them and shot one of them and shot at the other one was obvious intent, obvious evidence of his intent. Do you agree that the determination about whether he would have taken the stand but for the admission of the first two confessions is a factual determination? I believe it would need to be a factual determination, yes. So what do we – we've talked some, and your briefing and supplemental briefing does as well, about whether the exhaustion requirement applies to the state and epidefference. But what should we make of 2254E1 that provides for a presumption of correctness as applied to fact-finding by the trial court and that the applicant shall have the burden of rebutting the presumption of correctness by clearing convincing evidence? Do you agree that the presumption of correctness applies even where the findings are in favor of the petitioner? I don't know the answer to that, Your Honor, to be perfectly honest with you. I mean, I look at the facts and I don't think the facts, you know, substantiate the court's conclusion that he was compelled to testify when, you know, he himself during the PCRA hearing said, you know, my only defense was intoxication. That's what my lawyer said, so I had to testify. And that's why he called his girlfriend to testify in the first trial, and he didn't testify himself in the first trial. Thank you. That's all I have this morning. Does the court have any additional questions? Thank you very much. Thank you. Mr. Blue, or Mr. Capozzi, excuse me. Good morning. Good morning. Chris Capozzi for Jason Maple. Good morning. I think, Judge, I'm going to start with your question, which I believe was essentially the degree to which under E-1, the policies of finality and respect for the integrity of the state court legal proceedings should be no less applicable to a prosecutorial authority than it is a defendant. And I would submit to you that that presumption of correctness goes both ways. Counselor? Yes, Judge. E-1 is written specifically in terms of the applicant having the burden. The applicant you conceded in your supplemental brief is referring to the habeas petitioner, and you conceded with respect to a different provision that the exhaustion requirement does not apply symmetrically to the state. It seems like E-1 is written the same way when it says specifically the applicant, not the losing party. While it is written that way, Judge, I think the policy behind E-1 is finality and respect for the integrity of state court legal proceedings. All right. So we're supposed to disregard the plain wording in light of the geist or the spirit behind AEDPA, which is generally not understood to be favoring applicants, but rather, you know, limiting the availability of the writ. As E-1 is written, that is correct, Judge. But what you have here is you have a state court legal proceeding. The highest court in the Commonwealth of Pennsylvania that decided this found that these provisions, that is that these two statements were unlawful. Statement one was taken in violation of Miranda. Statement two immediately followed thereafter, and therefore it, too, is violative of the Fifth Amendment. All right. And your friend on the other side is not contesting that there's a violation, but violations of Miranda specifically, not Fifth Amendment voluntariness. Correct. So when you say Fifth Amendment, it's a little loose. But let's assume there is a Miranda violation, and we're, you know, your friend's not conceding. We're supposed to defer to that. But that deference goes both ways, and the deference to the harmless error finding should likewise protect that finding. Well, except that harmless error finding, Judge, was directly contrary to applicable Supreme Court case law. And the case law that you cite on this is pre-Elstad case law, and that the district court relied on pre-Elstad case law on what's the fruit of the poisonous tree. And so they're not applying the most recent case law, which says that, you know, if the confession was not coerced, and there's not evidence here that it fails the voluntariness test, then it ought to be let in. And there's no, I don't think you satisfy the Siebert test of this is a, you know, deliberately elicited. And in that case, it seems like the district court just applied the wrong law on what counts as fruit of the poisonous tree. Judge, I would disagree because I don't think that Elstad, Mathiasson, or Baylor, are anything like the case that's presently before the court. At least with respect to Elstad, Judge, it doesn't control, because there was no change in circumstances unlike in Elstad. That is, the location and the interrogation. In Elstad, there was a change in location and who the interrogators were. In Elstad, the lapse between the statements was over an hour. Here, it was just 30 minutes. But again, Judge, then we're getting back almost to the Miranda issue. And I think the real issue here is the Harrison issue and the implications that Harrison has in this case. And I do think that, you know, and I think your question is focused on. How do you deal with Fulminante? I'm sorry? How do you deal with Fulminante that, yes, you can have evidence so overwhelming that you have a harmless error ability in connection with a constitutional violation here? Well, Judge, as it relates to that issue, in this case, if you take the defendant's statements out of it, the evidence that implicates him is a series of corrupt and polluted sources. There are four witnesses that implicate him directly in this crime. Patrick Altman, who A, had a pending case during the trial, and B, had been subject to a crime of falsehood. So a jury has ample reason to doubt his testimony if it's not corroborated by Mr. Maple's testimony. With those cooperators and eyewitnesses at the bar, statements in front of the police, don't we have here far more than we did in Johnson v. Lamas, where there were just two witnesses who also had impeachment issues and said that the confrontation clause violation there nonetheless was harmless? Well, Judge, I think you get to when you look at that, you know, whether or not in this case, because the evidence is the superior court relied on it to corroborate their testimony, that is the testimony of Altman, Bernalski, Schenck, and Schenck, excuse me, Duane Schenck and Ryan Schenck, is Mr. Maple's own statement, and in particular, his statement at trial. But for that statement at trial, then the jury is left to rely on these witnesses who the judge, in her own instructions, described as corrupt and polluted sources. I'm not sure I've answered your question. It seems as if the evidence that shows guilt and the absence of intoxication is quite substantial. I've got about 20 items in front of me, and just take one of them. The Commonwealth presented substantial evidence that Maple did not appear intoxicated before, at the time of the shooting, or when he gave the confessions to the police officers. You look at the appendix 56, 243 to 244, 2499, 2124. I could go on and on, I mean, just on that one thing. And so one of his key arguments is, I was intoxicated.  And you have all this evidence that says, nope, didn't appear intoxicated at all. So what are we supposed to do with all that? Judge, but for the admission of his statements, perhaps, in fact, I would submit to you that the better trial tactic would have been for him not to testify and do one of two things, pursue a reasonable doubt defense. Yes, you have this evidence here, ladies and gentlemen, but does it get to beyond a reasonable doubt? The submission of his statements to the jury left him no other choice but to pursue a defense, and the available defense, quite frankly, is voluntary intoxication in this case. Counsel? Yes, Judge. So, I'm sorry, I want to let you finish your answer on that, because my question is slightly different. Let's say we don't accept the State's concession, and we ask whether this was, in fact, a Miranda violation in the first place. Doesn't California v. Baylor strongly suggest that there was no Miranda violation? It's very similar to this case. Judge, I actually find California v. Baylor to be a very different case and distinguishable in a number of respects. Let me find my notes, Judge. I apologize. The court held that there was no historical interrogation where Baylor was in account. Both defendants suspected a murder. Both went to the police station the day of the murder for questioning. Both were expressly told they weren't under arrest. I mean, the only difference is that Maple rode over in the police car, but he was told, not you have to, but, hey, parking's tough. So, supposedly for convenience. I'm not sure that makes it restraining him as much as an arrest would. Well, Judge, I just fundamentally disagree with your characterization of the differences. Mr. Maple was confronted at his girlfriend's home, a place she regularly stayed, by a half dozen armed police officers. It doesn't appear that Mr. Baylor asked to drive himself to the police station. And it does not appear that he was told that it would be better if they drove him. It doesn't appear that he was frisked. And it's clear in the record that Mr. Maple was frisked. It doesn't appear that his property was taken from Mr. Baylor. Mr. Maple's property was taken. He had a pocket knife on him. It doesn't appear that Mr. Baylor was separated from somebody close to him, his girlfriend. All these things lead somebody down the path of certain amount of psychological coercion. It doesn't appear that Mr. Baylor entered a secure building and was kept waiting for two hours. It doesn't appear that he was then questioned for an hour and then told by a police officer, and this is an important fact, that he was not telling the truth. And it doesn't appear that Mr. Baylor's prior military service was used to push him one way or another, or the fact that he came from a good family was used to push him one way or another. In other words, in the Baylor case, as I read the opinion, there's zero evidence of psychological pressure, whereas the psychological pressure, as it relates to Mr. Maple, was extraordinary. Even if we defer to the finding that the original confession was in violation of Miranda, what do we do with the taped statement that comes afterwards? We can't ascertain from the superior court's opinion whether there was a finding that the violation was deliberate or not, right? Judge, you cannot ascertain from the superior court's finding whether or not there was a deliberate violation, but the superior court, I believe, clearly determines that that statement, too, should have been excluded, because it doesn't rely on that statement in any way in its decision. Instead, it relies entirely on Mr. Maple's trial testimony. But it's not citing the key supreme court cases, the federal law that would be applicable in discussing this issue, and if it was not deliberate, then don't we need a finding of involuntariness for it to be inadmissible? Well, Judge, if you get to that point, but I think, as Judge Bassoon found, that statement immediately followed, or almost immediately followed the first statement. And there was very little change in circumstances. It was the same location. It was the same interrogators. The only thing that separated it was approximately a half an hour, during which time he had, that is, Mr. Maple had an emotional encounter and interaction with his girlfriend, Jennifer Vinsack. How is this different from Missouri v. Siebert? We've treated Justice Kennedy's opinion in that case as controlling, and that's the one that Judge Krause is referring to. I mean, short space, but we move away from a Miranda test towards a voluntariness test, and you have a very hard time satisfying an involuntariness test here. That's for, you know, some direct threats, not the kind of more murky psychological pressures that sometimes factor into Miranda analysis. Judge, I think that the psychological factors here are so strong that you do have a midstream Miranda issue. Colorado v. Connolly treated a statement as freely given when someone was in a hospital bed, as I recall, hooked up to tubes, on drugs, and a police officer came and questioned him when he was in a kind of a drug delirious state. That counts as voluntary. I mean, that suggests to me that things apart from threats, bribes, direct pressures are going to count as voluntary. Not familiar with the facts of the case you just mentioned, Judge. I'm not sure I'm prepared to address that. I should be. Having said that, what I see here is a defendant, at that time a suspect, who is subjected to extreme psychological pressure, and that but for that first and second statement that were offered, he would not have testified at trial. And maybe if he would only have just one statement, we don't know how it would have gone. The prosecution could have chosen just to use the taped statement, but that's not what happened, so I think we have to deal with the playing field as it is set, and the playing field as it is set in this case is statement one, statement two, and then you have his testimony. If we go back to the harmlessness question, let's assume that all three of them are in violation of Miranda, but as Judge Ambrose was recounting, the other evidence of guilt in the record is voluminous. You talked about it perhaps making a difference as to the defense that he would have put on, but isn't that the very problem, that when we're looking at Brecht, when we're looking at an actual prejudice standard, that we can't engage in that sort of speculation. It's not enough to show a substantial and injurious effect on the verdict. Judge, I would disagree, and perhaps I chose my word perhaps poorly. So what I would tell you is that I think the way you need to look at it, the way we should be looking at it is whether or not there was a substantial influence on the jury's verdict. I would submit to you that any time a defendant testifies, that in the end there is going to be a substantial influence on the jury's verdict, particularly, I'm about to run out of time, in a case like this one. So my final point would be, Judge, is that as Judge Bassoon found, we're looking at grave doubt. I'm out of time, so I'll stop talking. Any further questions? Thank you. Thank you to both counsel for well-presented arguments. Thank you, Judge.